**2021 UT App 90**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BOBBIE JOE SHARP JR.,
Appellant.

Opinion
No. 20190292-CA
Filed August 19, 2021

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 181900319

Wendy Brown and Sarah J. Carlquist, Attorneys
for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

POHLMAN, Judge:

¶1 Bobbie Joe Sharp Jr. pleaded guilty to one count of aggravated sexual abuse of a child, a first degree felony. After entering his plea and before sentencing, the victim (Victim) purportedly wrote a letter in which she recanted her allegations of Sharp's abuse. Alleging the letter exonerated him, Sharp orally moved to withdraw his plea, but the district court denied the motion and proceeded to sentence Sharp. On appeal, Sharp contends that Victim's supposed recantation rendered his guilty plea unknowing and involuntary and thus justified withdrawal of his plea. Alternatively, Sharp contends that the court should have continued sentencing and that it violated his right to allocution. We reject Sharp's arguments and affirm.

BACKGROUND

¶2     In January 2018, the State charged Sharp with two counts of rape of a child, three counts of sodomy on a child, one count of aggravated sexual abuse of a child, and one count of enticing a minor. As declared in the State's probable cause statement, Victim's grandmother reported that Sharp had given Victim, an eleven-year-old girl, a cell phone around Thanksgiving 2017 and that Sharp had been sending Victim sexually explicit messages.[1] The messages contained suggestions that Sharp and Victim should shower together and engage in anal sex. Victim stated that Sharp, who was nearly sixty years old, "dated her" and also sexually abused her. For example, Victim explained how Sharp made her give him "blow jobs" and taught her how to do a "69." Victim said that Sharp told her that he could not wait until he could take her virginity and Sharp would say, "Let's fuck, baby." Victim also described that when Sharp was in the shower with her, he told her to bend over, and he tried to go "in" her and would not stop even after she told him to stop.

¶3     At the preliminary hearing, the State introduced the DVD of Victim's interview at the Children's Justice Center, evidence that Sharp lived in Victim's apartment complex, and evidence that Sharp met Victim when he gave ice pops to her and the other children in the complex. Victim's mother testified that in the autumn of 2017, Victim spent time daily in Sharp's apartment and Sharp would walk her home in the evening. The State also introduced evidence that Sharp sent messages to Victim about "butt things" and told Victim that he "would

---

1. Because there was no trial in this case, we draw our description of events from the State's probable cause statement and the evidence presented at the preliminary hearing. We acknowledge that these details have not been proved and that the factual basis of Sharp's plea is not as detailed as our description of events.

stretch her butt out." After the preliminary hearing, the district court bound Sharp over for trial.[2]

¶4     Sharp engaged in plea negotiations with the State. Ultimately, in November 2018, the State amended the information to a single count of aggravated sexual abuse of a child, and Sharp pleaded guilty to that charge.

¶5     In his statement in support of his guilty plea, Sharp acknowledged that he "underst[ood] that by pleading guilty [he would] be admitting that [he] committed the crime[]" of aggravated sexual abuse of a child. He also "stipulate[d] and agree[d]" to a factual description of his conduct for which he was criminally liable. Sharp's statement also showed that Sharp "agree[d] to be sentenced to a term of 15 year[s] to life in prison."

¶6     The district court held a change of plea hearing, during which Sharp's counsel reiterated the factual basis for the plea. Counsel also acknowledged that Victim was eleven years old at the time of the offense and that Sharp's position of special authority was "akin to a babysitter."

¶7     The court conducted the requisite plea colloquy with Sharp. Sharp confirmed to the court that what his attorney described did in fact happen and that he was pleading guilty because he was guilty. Sharp also stated, among other things, that he understood the rights that he was giving up by pleading guilty. The court accepted Sharp's guilty plea, finding that the plea was "knowing and voluntary," that Sharp had the "advantage of very good counsel," and that he was "competent

---

2. Before bindover, the prosecutor amended the charges in two respects. She amended the count of aggravated sexual abuse to sexual abuse of a child, and she amended one count of rape of a child to include the alternative of sodomy on a child.

to enter a plea" and "underst[ood] the rights [he was] giving up by doing so." The court told Sharp, "If you want to ask to withdraw this plea, you'll need to do so in writing to me sometime before your sentencing."

¶8 Even though he was represented by counsel, Sharp himself wrote to the judge weeks later, stating that he "would like to cancel [his] plea deal and go to trial." Shortly afterward, Sharp's counsel filed a written motion to withdraw Sharp's guilty plea and attached Sharp's "sua sponte" letter to the motion. Sharp's counsel did not provide a basis for the plea withdrawal but requested that the court set oral argument on the motion and postpone sentencing. The court agreed to hold a hearing.

¶9 At the hearing on the motion to withdraw the guilty plea, Sharp's counsel began by informing the court that a letter, written to Sharp, recently "was intercepted at the jail" and was "purportedly from the victim in this case." Counsel continued, "[I]t is an exculpatory letter basically, which I believe would, if it is verified as being from [Victim], would be another basis to withdraw [Sharp's] plea." Counsel explained that the State had the actual letter while she had an electronic copy. In response, the prosecutor stated, "We have asked Unified Police Department to investigate. We believe it's a forgery. . . . And we don't have any word [from] them yet on the status of that investigation." The court thus decided to proceed with "handl[ing] the original motion to withdraw" while implying that the investigation could continue and "then we can figure out where that letter came from."

¶10 The court then asked Sharp to state the basis for his motion. Sharp responded that he had "misunderstood" the judge at the last hearing about whether he had "45 days to withdraw [his] guilty plea." Sharp also stated that his family told him that he should "let [his appointed counsel] go and bring on another attorney to represent [him]," but Sharp conceded

that he did not have the funds to hire a new attorney. The prosecutor opposed Sharp's motion to withdraw, arguing that Sharp had given "no basis" for withdrawal and he had merely "changed his mind." The court then again found that Sharp's plea "was entered knowingly and voluntarily," explaining to Sharp, "I find that the Rule 11 colloquy was given in its entirety by reference to the actual plea form itself, which your attorney went over with you, and I see no other possible reason, no other basis possible, that—that, in fact, your plea could be withdrawn."[3] Having denied the written motion to withdraw, the court scheduled the sentencing hearing. Before adjourning, the court again addressed the letter purportedly from Victim and indicated, "I'll get something from the prosecution talking about the letter . . . , and we'll see what the investigator has to say about that. And . . . based on what happens there, obviously, that will make our determination as to whether we're going to go forward or not."

¶11 At the sentencing hearing six weeks later, the court first inquired whether Sharp and his counsel had reviewed the presentence investigation report (the PSI). Counsel responded, "[W]e cannot go forward," and explained that Sharp's case "seems to be reassigned in [her] office"; that Sharp had written to the Utah State Bar complaining about counsel, the prosecutor, and the judge; and that counsel did not "feel like [she could] represent him." The court indicated that the bar complaint

---

3. Sharp makes no argument that the district court failed to comply with rule 11 of the Utah Rules of Criminal Procedure when it accepted his plea. *See generally* Utah R. Crim. P. 11 (setting forth the findings that a court must make when accepting a guilty plea); *State v. Alexander*, 2012 UT 27, ¶¶ 24–27, 279 P.3d 371 (explaining that compliance with rule 11 allows the district court to "test the knowing and voluntary nature of the plea" and "forecloses many potential arguments that the defendant's plea was not knowingly and voluntarily made").

would not "do that" and asked for any other reason to delay. Counsel responded that the police were "investigating the source" of the letter purportedly from Victim and stated, "I think that investigation needs to be completed before we can go forward with sentencing." The court disagreed. After learning that Victim and her mother were present at the hearing, the court decided to proceed with sentencing. The court again asked if Sharp and his counsel had reviewed the PSI, and when counsel said she had not, the court told counsel that it would take a recess to allow for that review before sentencing. Counsel again protested that she could not represent Sharp and that the case was being reassigned. The court responded, "Well, I think you can represent him. The fact that he filed a bar complaint, to me—I mean, he filed one against me. He filed one against the prosecutor. I don't think that has any bearing on this."

¶12    When proceedings resumed after the recess, counsel indicated that she had reviewed the PSI with Sharp and that it contained no factual inaccuracies. Counsel reiterated that she did not think that they could proceed, citing the fact that the court did not have the alleged recantation letter. The court acknowledged that it did not have the letter but it had "the implication to what the letter is, though." Counsel responded that the "letter, item by item, is exculpatory in every event that was alleged in this case." The court then queried, "And how does that affect . . . him knowing the plea?" Counsel answered, "[T]hat's being investigated by [the police]." Unsatisfied with that answer, the court tried again, asking "how that letter has anything to do with a person giving a knowing, voluntary, and intentional plea." Counsel responded, "Well, Your Honor, it's completely exculpatory, and that is being investigated by [the police]." The court then "accept[ed]" Sharp's objection, noting that Sharp had made his record.

¶13    Counsel then read Sharp's bar complaint aloud in court. Although the court acknowledged that counsel had said she could not "represent Mr. Sharp effectively in the sentencing," the

court nevertheless asked counsel to "[g]o ahead," and she then presented argument pertaining to sentencing:

> Mr. Sharp did take responsibility for what happened here. He did plead guilty. He agreed that he would go to prison, 15 to life. That is not an easy thing to do. And other than that, I don't know what to tell you. He's accepted responsibility at the time of [the plea]. However, now he's saying he's innocent . . . and there's evidence to support that.

The court stated, "I don't agree with the last part," and then invited the prosecutor to argue.

¶14    The prosecutor began by observing that, from her vantage point, Sharp's counsel had "been very effective" and had "explored all of the issues raised by the investigation." The prosecutor then asserted that Sharp had bought a cell phone for eleven-year-old Victim, communicated with her on it by "saying the things that he was going to do sexually to her," and actually sexually abused her. The prosecutor maintained that Sharp was "guilty not only of the crime he pled guilty to, but all of the crimes in the [original] information," and asserted that the presumptive sentence of fifteen years to life was "a very appropriate sentence." The court asked the prosecutor to explain "what Mr. Sharp actually participated in with this young girl," and the prosecutor provided some details of the abuse. Sharp's counsel then interjected that she "dispute[d] some of those facts." The court said, "[T]hat's fine," and asked counsel to move aside so that Victim's mother could address the court.

¶15    Victim's mother stated that while Victim was "very strong" and "resilient," what Sharp "put [Victim] through was devastating." The mother hoped that Sharp would not "get [the] chance" to "do this to another family," and she further stated, "[I]f it were up to me, I'd like him to stay in prison for the rest of

his life." The mother added that if Victim "had her way, [she] would not let him get out of prison either."

¶16   The court then addressed Victim directly, telling her, among other things, that the "fact that [she] came forward and said what [she] did . . . wasn't easy" and that made her "a hero." The court also told Victim that she bore "no blame" for Sharp's "despicable acts."

¶17   Turning to Sharp, the court asked him whether there was "anything [he] would like [the court] to know before" sentencing. Sharp answered, "No." The court followed up, "You don't have anything to say?" He replied, "No, sir."

¶18   The court then began to make a record of its rulings. It observed that the case had "been in the system for a long time now," given that the case was filed in January 2018 and sentencing was occurring in March 2019. In the court's view, this "slow ride through the system" was "painful, particularly for the family." The court further observed that Sharp's counsel had "done an outstanding job" and had "pushed the State on every issue that was important."

¶19   The court next addressed Sharp's guilty plea, finding that he "entered it knowingly, voluntarily, intelligently" and that he "knew exactly what he was pleading guilty to." The court found that Sharp had the plea "form read to him," that the court "went over the rights with him" and confirmed he "knew all those rights," and that Sharp acknowledged in open court that he understood. It observed that soon afterward, Sharp had "a little bit of buyer's remorse" and wanted to withdraw his plea. Notably, with regard to the letter purportedly from Victim, the court explained, "[T]here's some alleged letter out there that really, in my opinion, doesn't have any effect on anything, particularly in the state it's in right now." The court thus denied Sharp's oral motion to withdraw his plea.

¶20    The court then addressed the appropriate sentence for Sharp. It remarked that Sharp had put Victim through "something extremely terrible" and that his conduct was "unbelievable" and "unforgiveable." The court sentenced Sharp to a prison term of fifteen years to life. With regard to when Sharp would become eligible for parole, the court added, "I'm going to write a personal letter to the Board of Pardons and that letter is going to indicate that you should never, ever walk on this earth outside of that prison again. I expect that you'll die in prison, which I think that's what you should do."

¶21    Finally, the court put "one more thing" on the record. Regarding Sharp's bar complaint, the court found "absolutely no basis for any part of that letter." It expressed its view that the bar complaint was "another little trick to kind of push the system out." Because the complaint was "nothing more than that" and the case had been "going now for 14 months," the court gave the complaint no credence. The court ended the sentencing hearing by saying to Sharp, "When you entered that plea, if, in fact, you knew this was all false, you wouldn't have entered the plea, but you did. Good luck to you."

ISSUES AND STANDARDS OF REVIEW

¶22    On appeal, Sharp raises three main issues for our consideration. First, Sharp contends that the district court abused its discretion when it denied his oral motion to withdraw his guilty plea even though Victim purportedly wrote a letter recanting her accusations of abuse.[4] In the alternative, he contends that the court abused its discretion by not reserving its ruling on the motion to withdraw until the investigation into the letter could be completed. "We review the denial of a motion to

---

4. Sharp does not challenge the court's denial of his written motion to withdraw.

withdraw a guilty plea under an abuse of discretion standard . . . ." *State v. Gardner*, 2019 UT App 78, ¶ 7, 442 P.3d 1262 (cleaned up). A district court's decision regarding whether to continue a matter is generally reviewed for abuse of discretion. *See State v. Taylor*, 2005 UT 40, ¶ 8, 116 P.3d 360.

¶23    Second, Sharp contends that the district court abused its discretion when it did not continue sentencing to allow for, among other things, further investigation into the letter's authenticity. "This court reviews decisions involving continuances of sentencing only for abuse of discretion." *State v. Rivera*, 2016 UT App 202, ¶ 12, 385 P.3d 685.

¶24    Third, Sharp contends that the district court "imposed an illegal sentence when it denied Sharp his right to allocution." "The denial of the right to allocution is an issue of law that we review for correctness."[5] *West Valley City v. Walljasper*, 2012 UT App 252, ¶ 6, 286 P.3d 948.


ANALYSIS

I. Plea Withdrawal

¶25    Sharp first contends that the "district court abused its discretion when it denied Sharp's motion to withdraw his guilty plea based on a letter which supported a conclusion that Sharp was actually innocent of the alleged crime." According to Sharp,

---

5. The State asserts that the allocution issue and aspects of the continuance issues are not preserved for our review. But because we resolve these issues on the merits in the State's favor, we need not resolve the preservation questions. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

the letter "altered the evidentiary landscape to such a degree that Sharp cannot be said to have had sufficient awareness of the relevant circumstances or an understanding of the law in relation to the facts when he pled guilty." Thus, Sharp asserts, the "potentially exculpatory" letter "demonstrated that his guilty plea was not knowing and voluntary" and warranted its withdrawal. Alternatively, he contends that the court abused its discretion by ruling on the motion to withdraw before the investigation into the letter had been completed and before the court saw the actual letter. We conclude that Sharp's claim of error is unavailing.

## A

¶26 Any attempt to withdraw a guilty plea "is governed by statute." *State v. Alexander*, 2012 UT 27, ¶ 19, 279 P.3d 371. Utah's plea withdrawal statute provides that a guilty plea "may be withdrawn only upon leave of the court and a showing that it was not knowingly and voluntarily made." Utah Code Ann. § 77-13-6(2)(a) (LexisNexis 2017); *see also State v. Ruiz*, 2012 UT 29, ¶ 37, 282 P.3d 998 (explaining that the defendant bears the burden of proof on a motion to withdraw a plea). "To show that a plea was not knowing and voluntary, a defendant must show either that he did not in fact understand the nature of the constitutional protections that he was waiving by pleading guilty, or that he had 'such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt.'" *Alexander*, 2012 UT 27, ¶ 23 (quoting *Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976)). Sharp focuses his argument on the latter—whether he "had such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Id.* (cleaned up).

¶27 To have a complete understanding of the charge, "a defendant must possess 'an understanding of the law in relation to the facts.'" *Id.* ¶ 29 (quoting *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969)). "In determining whether a defendant

understands the law in relation to the facts, courts review whether the defendant understood the critical or essential elements of the crime to which he pled guilty." *Id.* ¶ 30 (cleaned up). A defendant thus "must understand what critical elements the State would have to prove beyond a reasonable doubt to secure a conviction." *Id.* ¶ 35. "Without knowing the elements that the State would have to prove, a defendant cannot intelligently weigh the risks and benefits of going to trial versus pleading guilty." *Id.* (cleaned up).

¶28 Sharp has not established that he lacked an understanding of "the law in relation to the facts" of his case when he pleaded guilty. *See id.* ¶ 30. To the contrary, Sharp acknowledged in his plea statement that he understood that by pleading guilty he would be admitting that he committed the crime of aggravated sexual abuse of a child. And the factual basis for the plea was explained to Sharp both in the plea statement and by his counsel at the change of plea hearing. The agreed-on factual basis was as follows:

> On or about June 1, 2017, through December 21, 2017, in Salt Lake County, Mr. Sharp[,] under circumstances not amounting to rape of a child, object rape of a child, sodomy upon a child, or an attempt to commit any of these offenses, touched the buttocks of a child, [Victim], with the intent to arouse the sexual desire of any person and Mr. Sharp was in a position of special authority that allowed him to exercise undue influence over [Victim].

This factual basis included the elements of the offense in relation to the factual allegations in Sharp's case. Moreover, Sharp told the court at the change of plea hearing that this description of events did happen and that he was pleading guilty because he was in fact guilty. *See supra* ¶ 7. The district court thus found Sharp's plea "to be knowing and voluntary." And Sharp simply

has not explained—either before the district court or this court—how the alleged recantation letter specifically impacted his understanding of the "critical or essential elements of the crime to which he pled guilty." *See Alexander*, 2012 UT 27, ¶ 30 (cleaned up).

¶29 Instead, Sharp invites us to conclude that a plea may be rendered involuntary under the current plea withdrawal statute[6] "[w]here post-plea but pre-sentence newly discovered evidence demonstrates the defendant's innocence." In extending this invitation, Sharp acknowledges that he is not aware of any Utah caselaw applying the current statute under such circumstances. In other words, although Utah courts have concluded that the discovery of post-plea, pre-sentencing evidence demonstrating factual innocence may constitute "good cause" to withdraw a plea under the pre-2003 version of the plea withdrawal statute,[7] Utah courts have yet to directly address whether the discovery

---

6. The Utah Legislature amended the plea withdrawal statute in 2003, "chang[ing] the standard for withdrawal of guilty pleas from good cause to a showing that the plea was not knowingly and voluntarily entered." *State v. Ruiz*, 2012 UT 29, ¶ 39, 282 P.3d 998 (Durham, J., concurring in part and dissenting in part); *see also* Utah Code Ann. § 77-13-6(2)(a) (LexisNexis 2017).

7. *See State v. Gallegos*, 738 P.2d 1040, 1041–42 (Utah 1987) (reversing the denial of a motion to withdraw a guilty plea under the pre-2003 version of the plea withdrawal statute based on the victim's under-oath recantation of her testimony accusing her boyfriend of assault), *superseded by statute as stated in Ruiz*, 2012 UT 29; *State v. Mildenhall*, 747 P.2d 422, 424 (Utah 1987) (applying the pre-2003 good cause standard to the defendant's motion to withdraw a guilty plea based on a victim's recantation of the allegations giving rise to the charge); *State v. Walker*, 2013 UT App 198, ¶¶ 27–32, 308 P.3d 573 (same).

of such evidence could render a plea unknowing or involuntary under the current statute.[8]

¶30 The State, however, urges us not to resolve this question on this record, arguing that "because Sharp cannot demonstrate that the purported recantation letter truly concerns factual innocence," the question he poses is purely hypothetical. It posits that "[w]here such evidence is not in the record, any opinion from this Court on the matter would amount to an advisory opinion." We agree with the State.

¶31 Whether post-plea, pre-sentence evidence demonstrating a defendant's innocence may render a plea unknowing or involuntary under the current plea withdrawal statute presents an interesting question. But when Sharp made his motion to withdraw his guilty plea, there was no such evidence before the district court. All the court had before it, at the time the motion to withdraw was made, was a proffer that there *might* be evidence supporting Sharp's innocence. Sharp never presented even a copy of the alleged recantation letter to the court so that it could assess whether the letter, based on its content, tended to show his innocence. And although Sharp contends that his proffer was undisputed and that the court was thus obliged to accept it, the proffer was limited. Sharp and the State agreed that a letter *purporting* to be from Victim was received at the jail, but, as Sharp concedes, the State "actively challenged the authenticity of the letter" and expressed its belief that it was a forgery.

---

8. The closest our appellate courts have come was in *State v. Archuleta*, 2019 UT App 136, 449 P.3d 223. There, without resolving the question, this court expressed some skepticism about the proposition, observing that "evidence discovered *after* entry of a plea does not necessarily go to whether the plea was knowingly and voluntarily made at the time it was entered." *See id.* ¶ 32.

¶32 Thus, even assuming the discovery of post-plea, pre-sentence evidence could render a plea unknowing and involuntary under the current plea withdrawal statute, Sharp has not shown that the court abused its discretion in denying his motion in the state it was in. Only if the letter were proved to be authentic could it potentially support the conclusion that Sharp is factually innocent. Yet no showing of authenticity was made. And because Sharp did not present to the court actual evidence demonstrating his innocence, the premise of his argument fails, and we must leave for another day the question of whether such evidence could render a plea unknowing and involuntary under the current plea withdrawal statute.[9]

B

¶33 In the alternative, Sharp argues that the district court acted prematurely and instead should have deferred its ruling on the motion to withdraw so that the police investigation into the letter could be completed.

¶34 A district court typically has broad discretion over whether to continue proceedings. *See State v. Taylor*, 2005 UT 40, ¶ 8, 116 P.3d 360. An abuse of that discretion "occurs when a trial court denies a continuance and the resulting prejudice affects the substantial rights of the defendant, such that a review

---

9. Sharp resists this conclusion, arguing that this court should resolve the legal question "because new evidence was discovered . . . , namely, a letter intercepted at the jail from the alleged victim." But even if we were to conclude that newly discovered evidence demonstrating factual innocence could render a plea unknowing or involuntary, that ruling would not benefit Sharp. His argument assumes the letter's authenticity and is nonspecific as to its actual contents. Without some demonstration that the letter was authentic, Sharp could only speculate that such evidence exists.

of the record persuades the court that without the error there was a reasonable likelihood of a more favorable result for the defendant." *Id.* (cleaned up); *see also State v. Peraza*, 2020 UT 48, ¶ 59, 469 P.3d 1023 ("When a defendant moves for a continuance under the common law, it is the defendant's burden to prove that a denial of the motion would be prejudicial."). In this case, Sharp would have to show that there was a reasonable likelihood of a more favorable result had the court reserved ruling on the motion to withdraw until the investigation into the letter's authenticity concluded. *See Taylor*, 2005 UT 40, ¶ 8. He therefore has to show it is reasonably likely that the letter would have been authenticated, that it demonstrated his innocence, and that it would have led the district court to conclude that the evidence rendered his plea unknowing and involuntary.

¶35   Sharp has not met this burden as we are not persuaded that the results of a finished investigation would have been reasonably likely to lead to a better result for Sharp. Even assuming late-arising exculpatory evidence could reach back and render a plea unknowing and involuntary, *see supra* ¶¶ 29–32, there is nothing in the record to suggest it is reasonably likely that the letter was an authentic retraction. If we were to remand this matter for the court to reconsider the motion to withdraw Sharp's plea, we would be doing so based on nothing more than speculation that the letter would be proved authentic. *See State v. Maestas*, 2012 UT 46, ¶ 286, 299 P.3d 892 (stating that "speculation that prejudice occurred is insufficient to satisfy [an appellant's] burden" on appeal); *cf. State v. Kirkwood*, 2002 UT App 128, ¶¶ 13–17, 47 P.3d 111 (explaining that appellate courts may not simply "speculate as to whether the alleged error was harmful").

¶36   Indeed, most of the information before the court suggested that Victim's allegations were credible and that she had not completely recanted. For instance, the court watched Victim's interview in which she described Sharp's abuse, and it found Victim to be "intelligent, articulate and credible." It

further noted that her answers were "internally consistent and included plausible details" about anatomy and clothing. Victim was able to describe matters that are normally outside the knowledge of an eleven-year-old, and Victim's statements were corroborated by Sharp's sexually explicit messages that he sent to her. This evidence lent credibility to Victim's allegations.

¶37    On the other hand, the evidence that Victim had completely recanted was comparatively weak. For example, the letter was intercepted at the jail, but it was unknown what the letter looked like and how a child would have known how to properly address and send a letter to Sharp in jail. A complete recantation on Victim's part was also inconsistent with her and her mother's presence and conduct at the sentencing hearing. Additionally, the letter surfaced in the context of Sharp having "buyer's remorse" over his plea and lodging a bar complaint as a "little trick" to delay the proceedings. This context suggested that the letter could well be yet another ploy.

¶38    Thus, on this record, we cannot conclude that Sharp has shown that the district court abused its discretion in not waiting to resolve the motion to withdraw Sharp's guilty plea until after the investigation into the letter's authenticity was complete. The authenticity of the letter remains unknown, and nothing in the record makes it reasonably likely that the letter would have been found authentic.[10]

---

10. To the extent Sharp suggests that the State's possession of the letter hindered his ability to show its authenticity, Sharp has not shown that any effort was made to reach a resolution on this issue in the six weeks between his hearings. In addition, other case circumstances potentially could be relied on to show a reasonable probability that another piece of evidence would eventually be authenticated. The other circumstances of this case, however, do not lend such support. *See supra* ¶¶ 36–37.

(continued…)

¶39    In sum, Sharp has not shown that he entered his guilty plea without understanding the law in relation to the facts. We further conclude that Sharp has not established that the district court exceeded its discretion in denying his motion to withdraw his guilty plea or that he was prejudiced by the court's refusal to extend the proceedings.

## II. The Refusal to Continue Sentencing

¶40    Sharp next asserts that if we do not allow him to return to the district court to withdraw his plea, this court instead should vacate his sentence and remand for a new sentencing hearing. On three grounds, Sharp contends that the district court abused its discretion when it proceeded to sentencing over his counsel's objection. We address each ground and conclude that resentencing is not warranted.

---

(…continued)

Sharp also argues that the district court should have waited until it was able to review the actual letter, but the court was not obliged to defer its ruling on Sharp's motion to withdraw until it "could personally review the letter." Although Sharp's counsel had an electronic copy of the letter, she did not offer that copy to the district court. Because Sharp "never sought to submit [a copy of the letter] to the [district] court, the court could not have erred by failing to consider [it]." *See State v. Kelson*, 2015 UT App 91, ¶ 13 n.3, 348 P.3d 373. Under the totality of the circumstances, we agree with the State that the court acted within its discretion to rule without waiting longer to review the letter.

Relatedly, Sharp asserts that the "district court's failure to consider all of the facts—namely, the letter—renders its findings clearly erroneous." This argument is unavailing for the same reason, *see id.*, and we are not otherwise persuaded that the court made any clearly erroneous findings, *see generally State v. Gardner*, 2019 UT App 78, ¶ 7, 442 P.3d 1262 (reviewing the district court's findings of fact for clear error).

¶41 The decision of whether to continue sentencing rests within the district court's sound discretion. *State v. Rivera*, 2016 UT App 202, ¶¶ 12–13, 385 P.3d 685 (explaining that the district court's decision not to grant a continuance for sentencing was an exercise of discretion that we review only for abuse). An abuse of discretion occurs when the court's decision is "clearly unreasonable and arbitrary." *Clarke v. Clarke*, 2012 UT App 328, ¶ 19, 292 P.3d 76 (cleaned up). And even when a district court exceeds its discretion in refusing to postpone the sentencing proceedings, the appellant must demonstrate prejudice from the district court's decision. *See Rivera*, 2016 UT App 202, ¶ 14. Thus, we will reverse the denial of a continuance only "when our review of the record persuades us that without the error there was a reasonable likelihood of a more favorable result for the defendant." *State v. Torres-Garcia*, 2006 UT App 45, ¶ 10, 131 P.3d 292 (cleaned up); *accord State v. Taylor*, 2005 UT 40, ¶ 8, 116 P.3d 360.

¶42 First, Sharp asserts that "the district court abused its discretion by ordering that sentencing proceed before the [oral] motion to withdraw [his plea] was resolved." According to Sharp, the district court contravened the plea withdrawal statute by "order[ing] that sentencing proceed before denying the pending motion to withdraw." But we agree with the State that the statute does not require that the motion be resolved before the court hears sentencing evidence. The plea withdrawal statute provides, "Sentence may not be announced unless the motion [to withdraw the plea] is denied." Utah Code Ann. § 77-13-6(2)(b) (LexisNexis 2017). Thus, it requires only that the court deny the motion before announcing the sentence. *See id.* The district court did exactly that. At the sentencing hearing, the court announced its denial of Sharp's oral motion to withdraw before it announced Sharp's sentence.

¶43 Second, Sharp argues that "the district court abused its discretion by forcing Sharp to proceed with sentencing where there were questions about whether defense counsel would

continue to represent him and where defense counsel had not previously had the opportunity to review the presentence report with Sharp." True, Sharp did lodge a bar complaint against his counsel. At the beginning of the sentencing hearing, defense counsel expressed her belief that she could not represent Sharp effectively at sentencing, noting that Sharp wrote a bar complaint and that his case "seems to be reassigned in [her] office." Counsel also read the complaint aloud in open court. But the court found no basis to disqualify Sharp's defense counsel—a decision Sharp does not challenge on appeal. And although defense counsel indicated at the beginning of the hearing that she had not yet reviewed the PSI with Sharp, the court took a recess for that express purpose. When the hearing resumed, counsel confirmed to the court that she had reviewed the PSI with Sharp. Given that the court allowed defense counsel time to review the PSI and saw no reason that defense counsel could not represent Sharp at the hearing, we conclude that the court acted reasonably under the circumstances.

¶44    Third, Sharp asserts that proceeding with sentencing forced his counsel to "take an untenable position: that Sharp had taken responsibility for his actions but also that the victim had recanted, thereby showing that Sharp was factually innocent of the crime pled to." Sharp argues that a continuance would have allowed for the police investigation into the letter to conclude and that his counsel could then have made a "cohesive, logical argument" that Sharp took responsibility for his crime by pleading guilty or, alternatively, that Victim "had withdrawn her allegations against Sharp." Sharp also asserts that either argument would have been likely to bring about "a more favorable result" for him.

¶45    Even assuming, without deciding, that the court should have continued the hearing to allow time for the development of a more cohesive argument, we are unconvinced that such argument would have been reasonably likely to lead to a more favorable sentence for Sharp. If counsel had argued only that

Sharp was accepting responsibility for his crime, that argument would have been directly contradicted by Sharp's own statement in the PSI that he "didn't do it" and by the PSI's notes that Sharp denied committing the crime and failed to take responsibility for his actions. On the other hand, if counsel had argued after further investigation that Victim's recantation letter was authentic, that argument would have been undercut by the fact that Victim and her mother were present at sentencing and signaled their preference for Sharp to stay in prison for life. That argument also likely would not have overcome the evidence of Sharp's guilt, including his own admission, Victim's credible interview, and Sharp's sexually explicit messages that corroborated Victim's allegations. *See supra* ¶ 36. In deciding on a fifteen-to-life prison sentence, the district court called Sharp's conduct toward Victim "unbelievable" and "despicable," and observed that Sharp put Victim through "something extremely terrible." Noting that it believed Sharp's conduct was "unforgivable," the court even went so far as to state its intention to write a personal letter to the Board of Pardons and Parole so that when Sharp became eligible for parole, the Board would know the court thought that Sharp "should never, ever walk on this earth outside of that prison again." In view of these statements and the other circumstances present here, we see it as unlikely that either one of the possible cohesive arguments that Sharp could have made with more time would have swayed the district court toward a more lenient sentence.[11]

¶46    For the foregoing reasons, we decline to vacate Sharp's sentence.

---

11. In connection with his challenge to the district court's refusal to continue sentencing, Sharp also argues that the court abused its discretion in making factual findings "without first reviewing the letter and learning of its authenticity." But this argument fails for the same reasons discussed above. *See supra* ¶¶ 35–38.

## III. Allocution

¶47 Finally, Sharp contends that we should vacate his sentence because it was imposed in violation of his right to allocution. Specifically, he argues that "[w]hile the district court offered Sharp the right to speak in his own behalf, it limited defense counsel's discussion of relevant information that bore on mitigation." We disagree.

¶48 "The right to allocution 'is an inseparable part' of a defendant's right under the Utah Constitution to be present in a criminal prosecution." *State v. Tingey*, 2014 UT App 228, ¶ 8, 336 P.3d 608 (quoting *State v. Anderson*, 929 P.2d 1107, 1111 (Utah 1996)); *see also* Utah Const. art. I, § 12 ("[T]he accused shall have the right to appear and defend in person and by counsel . . . ."). The Utah Rules of Criminal Procedure codify this right, providing that "[b]efore imposing sentence the court must afford the defendant an opportunity to make a statement and to present any information in mitigation of punishment, or to show any legal cause why sentence should not be imposed." Utah R. Crim. P. 22(a).[12]

¶49 Our supreme court has instructed that rule 22(a) "requires trial courts to affirmatively provide the defense an opportunity to address the court and present reasonably reliable and relevant information in the mitigation of a sentence." *State v. Wanosik*, 2003 UT 46, ¶ 23, 79 P.3d 937. "In this context, the 'defense' refers to both the defendant and defense counsel." *Tingey*, 2014 UT App 228, ¶ 8 (citing *Wanosik*, 2003 UT 46, ¶ 23). Thus, rule 22(a) "provides that a defendant and defense counsel be afforded an opportunity to make a statement and present information." *State v. Tapusoa*, 2020 UT App 92, ¶ 14, 467 P.3d

---

12. We cite the current version of rule 22(a) for convenience. Although this rule has been amended since the relevant time, the alterations are immaterial to this case.

912. "A trial court can 'affirmatively provide' the defense an opportunity for allocution by extending a 'simple verbal invitation or question,' but 'it is the court which is responsible for raising the matter.'" *Tingey*, 2014 UT App 228, ¶ 8 (quoting *Wanosik*, 2003 UT 46, ¶ 23). "Violations of a defendant's right to allocution usually involve situations where the court has prevented or prohibited the defendant from speaking altogether or imposed sentence in the defendant's absence." *State v. Graziano*, 2014 UT App 186, ¶ 5, 333 P.3d 366. In contrast, "a defendant's right to allocution is satisfied so long as the sentencing hearing was held in the defendant's presence and the defendant had an opportunity to speak." *Tingey*, 2014 UT App 228, ¶ 9 (cleaned up).

¶50 Because Sharp was present at the sentencing hearing and the district court asked him directly whether he had anything he wanted to say, the court inarguably afforded Sharp an opportunity to make a statement before sentencing. *See Tapusoa*, 2020 UT App 92, ¶ 12. The court similarly invited defense counsel to speak regarding sentencing. Still, Sharp contends on appeal that the district court violated his right to allocution by "limit[ing] defense counsel's discussion of relevant information." According to Sharp, the court refused to hear from defense counsel in two instances during the sentencing hearing.

¶51 The first instance occurred soon after defense counsel discussed the alleged recantation letter, Sharp's oral motion to withdraw, and Sharp's bar complaint. The court expressed appreciation for defense counsel's concerns but decided to "go forward with sentencing." The court then invited defense counsel to "[g]o ahead," and defense counsel addressed sentencing concerns in this exchange:

> [Defense counsel]: Your Honor, Mr. Sharp did take responsibility for what happened here. He did plead guilty. He agreed that he would go to prison, 15 to life. That is not an easy thing to do. And other

> than that, I don't know what to tell you. He's accepted responsibility at the time of plead[ing]. However, now he's saying he's innocent—
>
> The Court: I understand.
>
> [Defense counsel]:—and there's evidence to support that.
>
> The Court: Okay. Well, I don't agree with the last part. But go ahead, counselor.

The court then asked the prosecutor to address sentencing. Referring to this exchange, Sharp argues that the court improperly interfered with defense counsel's argument by interrupting after a few sentences and "asserting that it did not 'agree with the' idea that there was evidence to support a claim of innocence."

¶52   We read the transcript differently. In our view, the court afforded defense counsel an opportunity to provide pertinent information to sentencing. Defense counsel took that opportunity, albeit briefly, and before she mentioned that Sharp was "now . . . saying he's innocent," counsel suggested that she had little more to tell the court. While the court did interject that it disagreed that "there's evidence to support" innocence, defense counsel did not indicate a need to follow up. And because the transcript shows that, overall, defense counsel was an engaged and assertive advocate throughout the hearings, we think it unlikely that counsel would have stood idly by if she actually had more to add at that juncture. Thus, we do not share Sharp's view that the court "limited defense counsel's discussion" in this first instance.

¶53   As a second instance of alleged improper limitation on defense counsel, Sharp points to a moment soon after the prosecutor recited, at the court's behest, some of the details of

Sharp's abuse. Once the prosecutor finished her recitation, defense counsel said, "Your Honor, I dispute some of those facts." The court then stated, "If you wouldn't mind—that's fine. If you wouldn't mind moving off to the side there . . . ." At that time, the court invited Victim's mother to speak. Referring to this exchange, Sharp argues that the court restricted defense counsel's argument and instead should have allowed her to explain her disagreement with the facts as stated by the prosecutor.

¶54   We again do not perceive a problem during this second instance. Defense counsel completed her statement that she "dispute[d] some of those facts" without interruption. Instead of probing into this disagreement, the court moved on to hear from Victim's mother. But the court did not cut off defense counsel and was not obligated to inquire further. The court had already afforded Sharp and his defense counsel an opportunity to make a statement and present information, thereby satisfying Sharp's right to allocution. *See Tapusoa*, 2020 UT App 92, ¶ 14; *Tingey*, 2014 UT App 228, ¶ 9. Sharp has not persuaded us otherwise.

## CONCLUSION

¶55   First, we conclude Sharp has not shown that his guilty plea was unknowing and involuntary, that the district court abused its discretion in denying his motion to withdraw his plea given the state of the letter, or that he was prejudiced by the court's decision to rule before the investigation into the letter was complete. Second, we conclude Sharp has not established that the district court's decision to proceed with sentencing was an abuse of discretion or prejudicial. Finally, we conclude that Sharp was afforded his right to allocution at the sentencing hearing. We thus affirm the district court's decisions.